# United States Court of Appeals for the Federal Circuit

2007-5025, -5031

YANKEE ATOMIC ELECTRIC COMPANY,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

- - - - - - - - - - - - - - - - - - -

2007-5026, -5032

MAINE YANKEE ATOMIC POWER COMPANY,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

- - - - - - - - - - - - - - - - - - -

2007-5027, -5033

CONNECTICUT YANKEE ATOMIC POWER COMPANY,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

Catherine E. Stetson, Hogan & Hartson L.L.P., of Washington, DC, argued for all plaintiffs cross-appellants. With her on the brief were Paul A. Werner III and Jake M. Shields. Of counsel on the brief were Jerry Stouck and Robert L. Shapiro, Greenberg Traurig L.L.P., of Washington, DC.

Harold D. Lester, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Jeanne E. Davidson, Director, and Marian E. Sullivan, Trial Attorney. Of counsel on the brief was Jane K. Taylor, Office of General Counsel, United States Department of Energy, of Washington, DC.

Appealed from: United States Court of Federal Claims

Senior Judge James F. Merow

# United States Court of Appeals for the Federal Circuit

2007-5025, -5031

YANKEE ATOMIC ELECTRIC COMPANY,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

- - - - - - - - - - - - - - - - - - -

2007-5026, -5032

MAINE YANKEE ATOMIC POWER COMPANY,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

- - - - - - - - - - - - - - - - - - -

2007-5027, -5033

CONNECTICUT YANKEE ATOMIC POWER COMPANY,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

- - - - - - - - - - - - - - - - - - -

Appeal from the United States Court of Federal Claims in cases nos. 98-CV-126, 98-CV-474, and 98-CV-154, Senior Judge James F. Merow.

_____

DECIDED: August 7, 2008

_____

Before MAYER, LOURIE, and RADER, <u>Circuit Judges</u>.

RADER, <u>Circuit Judge</u>.

This appeal is one of many in the long line of contract disputes arising from the Government's failure to accept and dispose of radioactive waste from the nation's nuclear utilities. This is the first in a trio of concurrent opinions addressing the categories and amount of damages due to the utilities because of the Government's breach. <u>See</u> <u>Pac. Gas & Elec. Co. v. United States</u>, No. 2007-5046; <u>Sacramento Mun. Util. Dist.</u>, No. 2007-5052 et al.

Yankee Atomic Electric Company (Yankee Atomic), Maine Yankee Atomic Power Company (Maine Yankee), and Connecticut Yankee Atomic Power Company (Connecticut Yankee) (collectively the Yankees) originally brought this action seeking damages to compensate for the cost of storing spent nuclear fuel (SNF) and high-level radioactive waste (HLW) beyond the time that the Government promised by contract to begin storing that waste in a permanent and secure repository. Because the Court of Federal Claims did not assess damages according to the rate at which the Government was contractually obligated to accept the utilities' waste, this court reverses and remands.

I

The general factual background of the contracts and circumstances surrounding the SNF cases appears in the trial court's opinion and earlier opinions by this court. See Yankee Atomic Elec. Co. v. United States, 73 Fed. Cl. 249, 250-259 (2006) (Yankee I); see also Me. Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1337-40 (Fed. Cir. 2000). Accordingly, this opinion will only discuss the facts necessary for an understanding of the issues in this appeal.

The Yankees are three electric companies located in the northeastern United States. Maine Yankee produced nuclear power at its facility from 1972 until 1996, and elected to cease operations permanently in 1997. Connecticut Yankee produced nuclear power at its facility beginning in 1968 and shut down in 1996. Yankee Atomic, located in Massachusetts, generated nuclear power from 1960 until 1991.

Under the Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425 (codified at 42 U.S.C. §§ 10101-10270) (NWPA), the Yankees (and the remainder of the nation's nuclear utilities) entered into a contract with the Department of Energy (the Department or DOE) in 1983. That contract (the Standard Contract), discussed in greater detail below, obligated the Department to take title to and dispose of the Yankees' SNF and HLW. In exchange, the contract obligated the Yankees to pay removal and disposal fees into the Nuclear Waste Fund (NWF). The contract bound the Department to begin acceptance and disposal of nuclear waste by January 31, 1998. Yet, even though the Yankees have paid nearly $130 million in fees to the Government, the Department has not removed any of their radioactive waste.

The Department's failure to perform beginning on January 31, 1998 constituted a partial breach of the contract. See Me. Yankee, 225 F.3d at 1343; Ind. Mich. Power Co. v. United States, 422 F.3d 1369, 1376-77 (Fed. Cir. 2005). The parties in this appeal dispute only the amount of damages owed to the Yankees for that breach.

This damages inquiry focuses on whether the Department's breach was a substantial factor in the Yankees' decision to construct a dual-purpose dry storage facility to more safely and securely store their SNF. Another important inquiry involves the Government breach's alleged causal link to Maine and Connecticut Yankees' election to rerack their wet pool storage facilities to accommodate additional waste. The Court of Federal Claims found in favor of the Yankees on these counts (as well as several others), and awarded them a combined total of $142,795,520.55 in damages. Yankee I, 73 Fed. Cl. at 326.

The Government appeals because the trial court did not construct and refer to a non-breach world in calculating damages. Specifically, the Government complains that the trial court did not use the contractual acceptance rate to develop a non-breach scenario. Thus, according to the Government, the trial court did not evaluate whether the Yankees would have pursued dual-purpose dry storage even if the Department had timely performed. The Government likewise appeals the award of pre-breach mitigation damages for the reracks performed by Maine Yankee and Connecticut Yankee. In addition, the Government appeals the Court of Federal Claims' rulings that the disposal of Greater Than Class-C (GTCC) waste is covered by the Standard Contract, and that the Government is not entitled to an offset for the more than $312 million in contract fees that Maine Yankee and Connecticut Yankee have not yet paid. In their counter

appeal, the Yankees raise just one issue, requesting entry of partial (rather than final) judgment under Court of Federal Claims Rule 54(b) and retention of jurisdiction over the Yankees' claims for future damages from the Government's continued failure to perform.

II

This court reviews contract interpretation as a question of law without deference. Winstar v. United States, 64 F.3d 1531, 1540 (Fed. Cir. 1995) (en banc), aff'd, 518 U.S. 839 (1996). Evidentiary rulings receive review for an abuse of discretion. Flex-Rest, LLC v. Steelcase, Inc., 455 F.3d 1351, 1357 (Fed. Cir. 2006) (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141-43 (1997)). A trial court's selection of a causation standard likewise "depends upon the facts of the particular case and lies largely within the trial court's discretion." Citizens Fed. Bank v. United States, 474 F.3d 1314, 1318 (Fed. Cir. 2007).

The Government's primary challenge relates to the Court of Federal Claims' choice and application of the substantial factor causation standard. Citing to Indiana Michigan, the trial court elected to apply the "substantial factor" causation test rather than the more traditional "but for" test. Yankee I, 73 Fed. Cl. at 263-64. Use of that standard, which requires determination of whether the Government's breach of contract was a substantial factor in causing the plaintiff's damages, was within the trial court's discretion in this case. Although the substantial factor test is not preferred, this court has refrained from reversing trial courts that have applied the substantial factor test in Winstar and SNF cases. See, e.g., Citizens Fed., 474 F.3d at 1319; Ind. Mich., 422 F.3d at 1373.

While enjoying discretion to use the substantial factor test, the trial court must apply that test correctly. Specifically, damages for breach of contract require a showing of causation. The trial court erred in overlooking the Yankees' burden to prove causation. In this case, the Yankees can only sustain their damages claim if: "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." Ind. Mich, 422 F.3d at 1373 (emphasis supplied).

The fundamental causation difficulty in this contract is the absence of an explicit SNF or HLW acceptance rate or time table. Without an express timetable for removal of the Yankees' waste in the event the Government had kept its bargain, the Yankees cannot show the expenses they might have avoided. The Court of Federal Claims attempted to avoid this complexity by simply decreeing that any reasonable acceptance rate would have enabled the Yankees to avoid their incurred costs. Thus, without accounting for any acceptance rate at all, the trial court determined that the Department's breach substantially caused the Yankees' costs:

> Regardless of rate, these plaintiffs are faced with at least a twelve-year delay in commencement of performance. With due regard to the long lead time required for these mitigation decisions, the evidence establishes that the mitigating decisions and resulting expenditures were commercially reasonable and substantially caused by DOE's impending partial breach(es) and delay(s).

Yankee I, 73 Fed. Cl. at 268 (emphasis supplied). Such a simple direct approach to causation has a superficial appeal, but this intricate case demands more than estimates or assumptions as proof of causation. Thus, the Yankees had the burden to prove the contractual acceptance rate and apply that rate before suggesting that the

Government's breach was a substantial factor in causing the Yankees' claimed expenses. The trial court had the obligation to hold the Yankees to that burden.

"The remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." Ind. Mich., 422 F.3d at 1373. Without record evidence about the Yankees' condition with full Government performance, the Court of Federal Claims could not perform the necessary comparison between the breach and non-breach worlds and thus could not accurately assess the Yankees' damages. See Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (instructing that plaintiffs bear the burden of demonstrating "what might have been"); Bluebonnet Sav. Bank FSB v. United States, 67 Fed. Cl. 231, 238 (2005) ("[B]ecause plaintiffs in this case are seeking expectancy damages, it is incumbent upon them to establish a plausible 'but-for' world.").

The Court of Federal Claims' erroneous contract rate analysis highlights the necessity of identifying the contractual acceptance rate before assessing causation. For example, although not setting a rate, the trial court "augmented" several candidate acceptance rates to determine that the Department would likely have accepted the Yankees' waste early in the acceptance process.

> Applying any of the reasonable rates plus some augmentation also shows that in the nonbreach world, performance by DOE would have rather promptly removed substantial amounts of SNF such that, with demonstrated DOE performance, it would have been highly unlikely that the plaintiffs would have then proceeded to incur the substantial expense of building dry storage facilities.

Yankee I, 73 Fed. Cl. at 310. Indeed, the trial court's analysis is replete with examples where it "[a]ppl[ied] several different acceptance rates, but augment[ed] the rates by

various percentages" to determine causation. Id. at 306. This conclusion established the time when the Yankees would have been freed from their SNF and HLW storage obligations, thus setting a de facto minimum acceptance rate. Consequently, even in the trial court's analysis, some acceptance rate emerged as a necessary step. Nonetheless, the trial court did not acknowledge that the causation for the Yankees' storage expenditures depended on some comparison of the contractually-defined hypothetical world to the expenses actually incurred.

As part of its analysis, the Court of Federal Claims assumed, without formally interpreting the Standard Contract, that the Department would ignore the "oldest waste first" provision, 10 C.F.R. § 961.11 at Art. IV(B)(5)(a) (1984), and instead would have approved "exchanges" the Yankees would have brokered with other utilities to speed up removal of the SNF and HLW. See Yankee I, 73 Fed. Cl. at 303 ("Having heard the evidence over a seven-week trial, and upon due consideration, the court concludes that exchanges would have occurred in the nonbreach world."). These assumptions include further assumptions about the contractual acceptance rate. For example, the "exchanges" model adopted by the Court of Federal Claims assumes an acceptance rate of 3,000 metric tons of uranium.

These estimates and assumptions undercut the logic of the trial court's reasoning. Without setting forth an explicit acceptance rate for the SNF and HLW, the Court of Federal Claims apparently had in mind an approximate contract rate or range of rates and relied on that rate for some of its reasoning. In the absence of an express acceptance rate, this court lacks any means to evaluate the soundness of the Court of Federal Claims' contract interpretation. In any event, an acceptance rate based on

assumption and approximation is not enough to support a finding of causation under the substantial factor test. In sum, the trial court had an obligation to determine the SNF and HLW acceptance rate under the Standard Contract and apply that rate in determining the substantial cause of the Yankees' costs.

In this appeal's companion case, Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333 (2006), the Court of Federal Claims did conduct an analysis to set an acceptance rate, id. at 399-400. In reviewing that case, this court interprets the Standard Contract as requiring the Department to accept SNF and HLW in accordance with the 1987 annual capacity report process. Accordingly, this court vacates and remands with instructions that the Court of Federal Claims apply the Standard Contract acceptance rate identified in Pacific Gas to assess causation.

III

In addition to awarding damages for costs incurred after the Government's breach, the Court of Federal Claims also awarded the Yankees damages for pre-breach mitigation costs. Yankee I, 73 Fed. Cl. at 326. The trial court granted Maine Yankee $10,069,018 and Connecticut Yankee $8,350,893 to compensate for "reracking" expenses undertaken to mitigate the effects of the Government's then impending breach of contract. Id. Yankee did not claim any pre-breach mitigation expenses.

Reracking is a process that the nuclear utilities undertook to increase SNF storage capacity in spent fuel pools. In addition to reserving space to accommodate SNF in pools, utilities ideally maintain sufficient pool capacity to permit discharge of all fuel assemblies from the reactor core into the pool to accommodate maintenance and

repair operations. Though the Nuclear Regulatory Commission (NRC) does not require utilities to maintain such a "full core reserve," it encourages them to do so.

Maine Yankee filed an application with the NRC on January 25, 1993 to rerack its wet pool and increase storage capacity from 1,417 to 2,019 assemblies. Maine Yankee undertook this plan to increase the pool storage space while maintaining a full core reserve through the remainder of its licensed operating period. Upon receipt of approval from the NRC, Maine Yankee commenced its reracking plan. Although Maine Yankee was licensed to operate through 2008, the facility shut down in August of 1997. At that time, 26 of 29 racks had been installed pursuant to the 1993 rerack request.

Connecticut Yankee likewise applied to the NRC for authority to rerack its wet pool. The NRC approved Connecticut Yankees' March 1995 application for a rerack designed to maintain full core reserve through the plant's licensed operating period in 2007. Connecticut Yankee commenced reracking in 1996 but closed later that year.

The Government challenges the Court of Federal Claims' pre-breach mitigation award based on its misapprehension of this court's ruling in Indiana Michigan. The Government asserts that the Indiana Michigan Court held that the duty to mitigate damages for the imminent breach arose in 1994 for all SNF plaintiffs. To the contrary, this court did not impose that timing on all SNF cases in its Indiana Michigan decision.

In Indiana Michigan, this court acknowledged the propriety of pre-breach mitigation damages for plaintiffs who can prove foreseeability, causation, and reasonableness. 422 F.3d 1375-76. Faced with this additional ground for liability, the Government seeks to minimize its exposure by clinging to individual words and phrases in the Indiana Michigan opinion. In particular, the Government urges this court to

enforce the statement: "It is beyond debate that because the government unequivocally announced in 1994 that it would not meet its contractual obligations beginning in 1998, the utilities were in fact obligated to take mitigatory steps." Id. at 1375. This statement, however, does not set 1994 as the earliest possible date for any duty to mitigate. Rather, this passage reveals that this court in Indiana Michigan viewed 1994 as the latest possible date for the utilities' duty to mitigate, not the earliest. The full context of the statement shows this meaning. In the introductory clause ("It is beyond debate"), this court recognizes that no one could reasonably dispute that a duty to mitigate existed in 1994. This statement, however, is not a ruling that the duty to mitigate did not arise until 1994, but instead suggests that the duty could have arisen earlier.

The Yankees in this case relied on some of the same documents as the Indiana Michigan Power Company to demonstrate the reasonableness of their belief that the Government would not timely perform. The confluence of some evidence in the records of Indiana Michigan and this case, however, does not mean that both cases spring from the same fountain. This court in Indiana Michigan ultimately affirmed the trial court's denial of the plaintiff's pre-breach mitigation request based on the facts of that case. 422 F.3d 1376. This case has a different record. The Indiana Michigan Court based its affirmance of the trial court on the trial court's specific factual findings. In particular, the court noted that Indiana Michigan "authorized the expenditure for its reracking projects in 1989, in the normal course of business." Id. (emphasis supplied). This court also cited the trial court's findings "that Indiana Michigan's rerack schedule was not affected by the 1987 and 1989 DOE announcements projecting delays in the scheduled January 1998 acceptance start date." Id. This court also noted that the utility's decision to

perform a full rerack rather than a partial one "was purely a business judgment," unrelated to the Government's partial breach. Id.

Those Indiana Michigan findings stand in stark contrast to the record that this court confronts in this case. For example, the trial court found that Maine Yankee was "[m]indful of storage limitations and implementation lead time," and "well aware of significant delays" to the Government's performance "from at least the mid-1980s." Yankee I, 73 Fed. Cl. at 275. The trial court also found persuasive the Yankees' testimonial and documentary evidence that the utilities' rerack decisions were based on a reasonable belief that the Government would not timely perform. Id. at 275-284. This court will not overturn the trial court's thorough and well reasoned findings simply because its findings differ from those in Indiana Michigan.

This court also assesses the reasonableness of the Yankees' reracks in light of the record evidence that these mitigation efforts allegedly began years before necessary and allegedly proved completely unnecessary because the reactors shut down early. The record shows that the reracks were not premature. Rather, the record shows that the Government placed the Yankees in a position requiring immediate steps to find alternate storage and to "accept responsibility to guard against the environmental impact of improperly-disposed and maintained SNF, a situation which the NWPA was enacted to avoid." Ind. Mich., 422 F.3d 1375. In that position, "[i]t would have been improvident for [the Yankees] to have waited until January 1998 before deciding what to do with [their] nuclear waste." Id. Accordingly, the trial court found, and this court affirms, that in light of the amount of time required to engineer, fabricate, and install new racks, the Yankees' rerack schedule was reasonable.

The record also shows that the reracks were reasonable even though early closure of some facilities rendered some of the efforts unnecessary. The Yankees are "'not precluded from recovery . . . to the extent that [they have] made reasonable but unsuccessful efforts to avoid loss.'" Id. (quoting Restatement (Second) of Contracts § 350 comment b). Because the rerack efforts were reasonable, foreseeable, and caused by the Government's partial breach, their ultimate success and usage is irrelevant. Accordingly, this court affirms the trial court's findings that the Yankees' rerack decisions were "commercially reasonable" and "foreseeable to DOE at the time of contracting." Yankee I, 73 Fed. Cl. at 279, 283.

Causation, the remaining pre-breach mitigation factor, presents more difficulty for the Yankees. As explained in section II above, the trial court must apply the contract rate when assessing causation under the substantial factor test. Thus, although this court affirms the Court of Federal Claims' findings with respect to the foreseeability and reasonableness prongs of the pre-breach mitigation damages test, it must nevertheless remand as to causation. In particular, the Court of Federal Claims must apply the Standard Contract acceptance rate in evaluating whether the Government's partial breach of contract was a substantial factor in causing the Yankees to rerack.

IV

The Court of Federal Claims determined that the Standard Contract requires the Government to accept GTCC radioactive waste concurrently with SNF and other HLW. Yankee I, 73 Fed. Cl. at 313-15. In particular, this determination affects the amount of damages because GTCC waste storage costs, purportedly "reaching potentially into the

hundreds of millions of dollars," Appellant's Br. 56, may well not have occurred in a non-breach world.

GTCC waste is one of the radioactive byproducts of nuclear power generation. See 10 C.F.R. § 61.55(a)(2). Nuclear power generation creates GTCC when the metal components of a reactor, including the inside of the core shroud surrounding the nuclear core, control rods, and support plates that hold the reactor together, absorb neutrons during operation and become irradiated. Utilities must dispose of GTCC waste before they can decommission reactor sites.

The Standard Contract "applies to the delivery by Purchaser to DOE of SNF and/or HLW . . . , acceptance of title by DOE to such SNF and/or HLW, subsequent transportation, and disposal of such SNF and/or HLW . . ." Id. § 961.11 at Art. II. GTCC does not qualify as SNF. The trial court, however, fit the GTCC within the Standard Contract's definition of HLW. Pursuant to the contract, the term "high-level radioactive waste" means:

> (A) the highly radioactive material resulting from the reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste that contains fission products in sufficient concentrations; and

> (B) other highly radioactive material that the [NRC], consistent with existing law, determines by rule requires permanent isolation.

Id. at Art. I(12)(b) (emphasis supplied); see also 42 U.S.C. § 10101(12)(B) (2000). Because GTCC "must be disposed of in a geologic repository," the Court of Federal Claims reasoned, the NRC has in fact promulgated a rule requiring permanent isolation of these radioactive byproducts. Yankee I, 73 Fed. Cl. at 313-15. The NRC rule in question, passed in 1989, provides:

> Waste that is not generally acceptable for near-surface disposal is waste for which form and disposal methods must be different, and in general

2007-5025, -5031, -5026,           14
-5032, -5027, -5033

more stringent, than those specified for Class C waste. In the absence of specific requirements in this part, <u>such waste must be disposed of in a geologic repository</u> as defined in part 60 or 63 of this chapter unless proposals for disposal of such waste in a disposal site licensed pursuant to this part are approved by the Commission.

10 C.F.R. § 61.55(a)(2)(iv) (emphasis supplied). With no alternative proposals for disposal of GTCC waste, the rule in effect mandated that GTCC fall within the disposal options in the Standard Contract. Indeed, the trial court pointed out, the record contains ample documents demonstrating the Government's intent to "pursue co-disposal of GTCC" in a geologic repository with SNF. <u>See, e.g.</u>, Terry Plummer, Department of Energy, Office of Environmental Management, Greater-Than-Class C Radioactive Waste Management Presentation (June 7, 1995). On another occasion, the Government recognized that such waste should be stored "in a geologic repository licensed under one regulation for high level waste (HLW) disposal." Letter from Robert Bernero, Director, Office of Nuclear Material Safety and Safeguards, Nuclear Regulatory Commission, to John Bartlett, Office of Civilian Radioactive Waste Management, Department of Energy (July 23, 1990). Finally, the Government sent Yankee Atomic a letter announcing its intent to accept and store GTCC with SNF:

> In January 1993, we began a reassessment of the [GTCC] Low-Level Waste Program strategy. The reassessment was completed in September 1993, and strongly suggested that the Department should consider co-disposal of utility-generated [GTCC] Waste in the geologic repository being developed by the Department for disposal of high-level radioactive waste and spent nuclear fuel.

Letter from Thomas Grumby, Assistant Secretary for Envirionmental Management, Department of Energy, to Jay Thayer, Vice President and Manager of Operations, Yankee Atomic Electric Company (Dec. 20, 1994). The letter supports the trial court's determination that the Government agreed to accept GTCC with SNF and other HLW. The letter further endorsed Yankee Atomic's plan to load GTCC waste into canisters for

2007-5025, -5031, -5026, -5032, -5027, -5033

15

disposal with SNF: "We note in your letter that you have assumed that such waste will be loaded into multipurpose canisters for disposal along with spent fuel." Id. The parties' intentions and actions, as revealed by these documents and numerous others in the record, provide firm footing for the trial court's conclusion that "it is very unlikely that DOE would remove all SNF without also taking plaintiffs' GTCC waste." Yankee I, 73 Fed. Cl. 314.

The NRC's regulations defining HLW do not compel a different result. Similarly, a 2005 amendment to the Low-Level Radioactive Waste Policy Amendments Act of 1985, Pub. L. No. 99-240 ("LLRWPA") that mandated a study of GTCC waste disposal does not preclude reading the Standard Contract to include GTCC within the HLW definition. In particular, 10 C.F.R. § 60.2 (1983) provides:

> High-level radioactive waste or HLW means: (1) Irradiated reactor fuel, (2) liquid wastes resulting from the operation of the first cycle solvent extraction system, or equivalent, and the concentrated wastes from subsequent extraction cycles, or equivalent, in a facility for reprocessing irradiated reactor fuel, and (3) solids into which such liquid wastes have been converted.

Notably this definition does not include GTCC waste. The definition of HLW waste in an NRC regulation, while a factor considered by this court and the trial court, does not control the parties' understanding of HLW as set forth in the Standard Contract. As the trial court properly pointed out, the Standard Contract treats and defines GTCC waste in manner that satisfies the definition of HLW. Id. Thus, the Standard Contract, not the NRC's regulations, controls the parties' contractual obligations. The NRC cannot change the contract by regulation. Moreover, as noted by the trial court, the technical regulatory definition of HLW does not overcome a rule that unambiguously requires permanent isolation of GTCC waste. See Christensen v. Harris County, 529 U.S. 576,

588 (2000) (deference to agency's interpretation of its own regulation is "warranted only when the language of the regulation is ambiguous").

Without alternative proposals, much less approved proposals for GTCC waste disposal, the Yankees have, for years, incurred the costs of storing GTCC waste. These costs arose because the Government did not provide any alternative for permanent isolation. In addition, as the trial court found, the record shows that the Government planned to (and would have) removed the GTCC with the SNF. Thus the trial court correctly determined that the parties interpreted the contract to include GTCC within HLW and acted accordingly. For these reasons, this court affirms the Court of Federal Claims' finding that "the conclusions reached with respect to recoverability of SNF storage expenses are equally applicable to GTCC waste, which is stored on-site in the same manner as SNF." Yankee I, 73 Fed. Cl. 315.

The trial court's finding, however, does not mean that the Government will have to bear the cost of GTCC waste disposal alone. The proper valuation of GTCC waste disposal remains open for adjudication in future proceedings once the costs of this operation are fully realized and understood.

V

The quid pro quo between the Government and the utilities embodied in the Standard Contract burdened the Government with responsibility for permanently disposing of SNF and HLW in exchange for the utilities' agreement to pay for that disposal. This court next assesses the implications of the Yankees' obligations. Specifically, this court needs to determine if the Yankees must pay contract fees not yet due to the Government because of the Government's long standing failure to perform.

Under the Standard Contract, nuclear utilities must pay the Government a one-time fee for the disposal of SNF used to generate electricity prior to April 7, 1983. This fee is separate from the fees for younger waste. The contract provides the utilities with three options for payment of this one-time fee. Option 1 allows the utilities to prorate the fee evenly over 40 quarters, with interest; Option 2 allows the utilities to defer payment until a time before waste delivery, also with interest; and Option 3 allows the utilities to escape interest payments by remitting the entire fee amount by June 30, 1985. 10 C.F.R. § 961.11 at Art. VIII(B)(2)(a)-(c). Yankee Atomic paid the amount in full under Option 3. Maine and Connecticut Yankee, on the other hand, chose Option 2. With interest, Maine Yankee now owes more than $159 million on an original fee amount of approximately $50 million. Connecticut Yankee owes more than $153 million on an original fee amount of about $49 million. Although the Government has not yet collected any SNF, or even set a collection date, it nevertheless demands an offset in any damages due to Maine and Connecticut to account for these fees. Of course, the problem is that the obligation to pay these fees is unlikely to arise anytime in the foreseeable future, if at all.

In its entirety, Option 2 provides:

The Purchaser's financial obligation shall be paid in the form of a single payment <u>anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule</u>, and shall consist of the fee plus interest on the outstanding fee balance. The interest is to be calculated from April 7, 1983, and compounded quarterly thereafter by the 13-week Treasury bill rates as reported on the first such issuance of each succeeding assigned three-month period until payment.

Id. at Art. VIII(B)(2)(b) (emphasis supplied). The contract further specifies that "delivery" means "transfer of custody, f.o.b. carrier, of spent nuclear fuel or high-level radioactive waste from Purchaser to DOE at the Purchaser's civilian nuclear power reactor or such

other domestic site as may be designated by the Purchaser and approved by DOE." Id. at Art. I(7).

As the plain language of the contract clause and related definition make clear, the Yankees must pay the one-time fee before the waste delivery date set in an approved delivery commitment schedule (DCS). Sadly, no valid DCS is in place for the Yankees. The Government stopped processing and approving DCS submittals over a decade ago in the late 1996 to early 1997 time frame. In 1998, the Government sent a letter to Connecticut Yankee explaining that it could not approve Connecticut Yankees' DCS submittal and waiving until further notice the contract requirement that Connecticut Yankee even provide such schedules.

Indeed, even though the Government approved numerous DCS submittals from the Yankees over the years, it never complied with those schedules. Instead, the Government pushed back the DCS start dates from 1998 to 1999, then to 2000, and eventually to 2006. Of course, the record shows that 2006 has come and gone without any compliance with any DCS.

Nevertheless, the Government seeks payment of the one-time fee as a condition precedent for acceptance of the Yankees' nuclear waste. In one sense, the Yankees would have had to pay the one-time fee in a non-breach world—i.e., one where DOE timely performed—and they did not pay that fee in the breach world—i.e., the real world where the Government abandoned the DCS process. While this view of the Yankees' obligation correctly recites this court's rule that "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach," Bluebonnet, 339 F.3d at 1345, the application of that rule does not make the

Yankees' one-time payment a condition precedent or offset for an award of damages. In simple terms, the comparison of breach and non-breach worlds does not convert this case from a suit for partial breach of contract into a case for a total breach of contract. Because this case presents a partial breach of contract, the Yankees' ongoing contractual obligation has not yet matured under the terms of the contact itself.

As this court has already acknowledged, the NWPA and the terms of the Standard Contract foreclose any claim for total breach. See Ind. Mich., 422 F.3d at 1374 (noting that the Department would have been discharged from further responsibility for disposal of SNF and HLW if the utility would have pursued a claim for total breach—an outcome foreclosed by the NWPA). Indeed, the Yankees "had no choice but to hold the government to the terms of the Standard Contract while suing for partial breach." Id. If this case featured a total breach, then the Government would be entitled to an offset for the disposal fees that are not yet due. However, in this partial breach scenario, the Yankees—the non-breaching party—have no obligation to make payments that have not yet become due. When those obligations mature, the Yankees must then comply with the ongoing requirements of the contract:

> Damages [for a partial breach] are calculated on the assumption that both parties will continue to perform in spite of the breach. They therefore compensate the injured party only for the loss it suffered as the result of the delay or other defect in performance that constituted the breach, not for the loss of the balance of the return performance. Since the injured party is not relieved from performing, there is no savings to it to be subtracted.

E. Alan Farnsworth, Farnsworth on Contracts § 8.15 (2d ed. 2000) (emphasis supplied). In many cases featuring a total breach without ongoing obligations under the contract, this court has awarded an offset for the non-breaching party's surviving requirements. See, e.g., Rumsfeld v. Applied Cos., 325 F.3d 1382 (Fed. Cir. 2003) (awarding total

breach damages for the Government's breach of a requirements contract); White v. Delta Constr. Int'l, Inc., 285 F.3d 1040 (Fed. Cir. 2002) (awarding total breach damages for the Government's breach of a minimum dollar amount contract). In this partial breach case where the parties' performance obligations survive, the non-breaching party is not at this time responsible for obligations that must be performed later, when they mature. In this case, the Yankees have sued for partial breach to recover storage costs caused by the Government's protracted performance delay. All parties—the Yankees and the Government—retain their substantive rights and obligations under the contract. Thus, the Government must still permanently dispose of the SNF and HLW; the Yankees must still pay the one-time fee, with interest, before the first delivery of waste to the Department but subsequent to institution of a valid DCS. Just as the utilities cannot now collect damages not yet incurred under the ongoing contract, see Ind. Mich., 422 F.3d at 1376-77, the Government cannot prematurely claim a payment that has not become due. As Chief Judge Damich of the Court of Federal Claims observed in a related case, "the setting of the delivery date was itself a condition of Plaintiff's payment obligation." Consumers Energy v. United States, 65 Fed. Cl. 364, 371 (2005). Moreover, the Government's own refusal to timely perform cannot serve as a basis for accelerating plaintiffs' performance obligations. The Yankees' obligations under the contractual scheme have not matured. As the trial court correctly noted, "[t]he deferred payment option for pre-April 7, 1983 fees is keyed to the first delivery of SNF/HLW to DOE under an approved schedule. This has not occurred and apparently will not occur for some period of time." Yankee I, 73 Fed. Cl. at 325.

The trial court also correctly determined that the NWPA forecloses an offset because it requires that spent fuel fees be deposited into the NWF "immediately upon their realization," and that the fund can only be used "for purposes of radioactive waste disposal services." 42 U.S.C. § 10222(c)-(d). The Eleventh Circuit has interpreted this statute as prohibiting the Government from using "NWF monies to pay for the interim storage costs of the Department's contract creditors." Ala. Power Co. v. Dep't of Energy, 307 F.3d 1300, 1312 (11th Cir. 2002). Thus, as the trial court correctly found,

> Allowing [Appellant] to offset damages with fees would bypass the NWF and effectively use NWF dollars to pay partial breach damages, or more precisely deny the NWF the fees, in violation of the NWPA—the precise situation condemned in Alabama Power. Damages come from the Judgment Fund, not the NWF. 31 U.S.C § 1304; 28 U.S.C. § 2517.

Yankee I, 73 Fed. Cl. at 325.

Another federal judge, Judge Bruggink of the Court of Federal Claims, correctly notes in a related case:

> [The Yankees] still have the SNF, the government still has the obligation to pick it up, and plaintiffs still have to pay the one-time fee when it becomes due. The only thing that is different from the contract scenario is that [the Yankees] claim to have been forced to absorb unnecessary interim storage costs. If the government reimburses such costs, it hardly puts plaintiffs in a better position.

Dominion Res. Inc. v. United States, 77 Fed. Cl. 151, 156 (2007). Accordingly, this court affirms the trial court's denial of a damages offset for the unpaid fees.

VI

The Yankees present just one issue on cross-appeal: whether the trial court abused its discretion by refusing to maintain jurisdiction over their claims for future damages under Court of Federal Claims Rule 54(b). The Yankees charge that the trial court erred in entering final judgment, but instead should have entered partial judgment

and retained jurisdiction over the Yankees' claims for future damages. This course, according to the Yankees, has exposed them to the admittedly remote possibility that the Government might prevail on a statute-of-limitations argument at some point down the road, precluding the Yankees from obtaining a full recovery.

To the contrary, the trial court heard evidence for damages incurred by Yankee Atomic and Connecticut Yankee through 2001, and for Maine Yankee through 2002. The lower court dismissed damages claims beyond those dates without prejudice to their timely assertion in subsequent actions. Yankee I, 73 Fed. Cl. at 263.

The Court of Federal Claims did not have jurisdiction to consider the Yankees' demand for future damages. "If the breach of an entire contract is only partial, the plaintiff can recover only such damages as he or she has sustained, leaving prospective damages to a later suit in the event of future breaches." Ind. Mich., 422 F.3d at 1376. "[S]ubsequent claims accrue for the purposes of the statue of limitations at the time such damages are incurred." Id. at 1378. Because jurisdiction is established at the time of filing of the complaint, the Yankees' claims for damages that had not yet accrued when the complaint was filed were not ripe for consideration by the trial court.

Moreover, the Yankees have not identified any abuse of discretion in this case. They admit that the risks posed by the lower court's decision are "remote" and "slight." Appellee's Br. 71. Their only worries are that this court will neglect to enforce its decision in Indiana Michigan, or that they will forget to timely file future claims. These concerns, though imaginative, do not justify a ruling that the district court abused its discretion. This court affirms the Court of Federal Claims' denial of the Yankees' Rule 54(b) motion.

<u>AFFIRMED-IN-PART</u>, <u>REVERSED-IN-PART</u>, and <u>REMANDED</u>

COSTS

Each party shall bear its own costs.