NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2007-5052, -5097

SACRAMENTO MUNICIPAL UTILITY DISTRICT,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

Timothy R. Macdonald, Arnold & Porter LLP, of Denver, Colorado, argued for plaintiff-cross appellant.  With him on the brief were David S. Neslin, of Denver, Colorado, and Howard N. Cayne, of Washington, DC.

Alan J. Lo Re, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Jeanne E. Davidson, Director, Harold D. Lester, Jr., Assistant Director, and Joshua E. Gardner and Scott R. Damelin, Trial Attorneys.

Appealed from:  United States Court of Federal Claims

Judge Susan G. Braden

NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2007-5052, -5097

SACRAMENTO MUNICIPAL UTILITY DISTRICT,

Plaintiff-Cross Appellant,

v.

UNITED STATES

Defendant-Appellant.

Appeal from the United States Court of Federal Claims in Case No. 98-CV-488, Judge Susan G. Braden.

_____

DECIDED: August 7, 2008

_____

Before MAYER, LOURIE, and RADER, Circuit Judges.

RADER, Circuit Judge.

This appeal is one of many arising from a longstanding contract dispute between the nuclear power industry and the Government.  It represents the third in a trio of cases addressing the damages owed to the nation's nuclear utilities because of the Government's failure fulfill its contractual obligation to accept and dispose of the utilities' radioactive waste.  See Yankee Atomic Elec. Co. v. United States, No. 2007-5025 et al. (Yankee II), Pac. Gas & Elec. Co. v. United States, No. 2007-5046 (PG&E II).

Sacramento Municipal Utility District (SMUD) originally brought this action seeking damages to compensate for the cost of storing spent nuclear fuel (SNF) and high-level radioactive waste (HLW) beyond the time that the Government promised, by contract, to begin storing that waste in a permanent and secure repository. Finding that the Government's breach was a substantial factor in SMUD's decision to complete its dry storage facility, the Court of Federal Claims awarded SMUD $39,796,234 in damages. Sacramento Mun. Util. Dist. v. United States, 74 Fed. Cl. 727, 735 (2006) (SMUD II). Because the Court of Federal Claims did not assess damages according to the rate at which the Government was contractually obligated to accept the utility's waste, and because that court erred in allowing the Government to deduct a number of offsets from the amount owed to SMUD, this court reverses and remands.

I.

The general factual background of the contracts and circumstances surrounding the SNF cases appears in the trial court's opinion and earlier opinions by this court. See Sacramento Mun. Util. Dist. v. United States, 70 Fed. Cl. 332, 336-56 (2006) (SMUD I); see also Me. Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1337-40 (Fed. Cir. 2000). Accordingly, this opinion will only discuss the facts necessary for an understanding of the issues in this appeal.

SMUD, a California public utility, owns the Rancho Seco nuclear power plant. SMUD shut the plant down in 1989 in response to a voter referendum. At that time, SMUD had 493 SNF assemblies onsite in a wet pool. In light of this closure, SMUD sought to decommission Ranch Seco, and thereby reduce its "nuclear footprint." SMUD I, 70 Fed. Cl. at 340.

Consistent with the Nuclear Waste Policy Act of 1982 (NWPA) (codified at 42 U.S.C. §§ 10101-10270), SMUD (like all of the nation's nuclear utilities) entered into a contract (the Standard Contract) with the Department of Energy (the Department or DOE) on June 14, 1983. Under that contract, SMUD paid approximately $40 million into the Nuclear Waste Fund (NWF). In return, the Department agreed to begin acceptance and disposal of SNF and HLW from SMUD (and all of the other utilities) on January 31, 1998. The Department did not timely perform. In fact, the Department has yet to begin performance. Indeed, even though the contract obligated the Department to take title to and dispose of all of SMUD's SNF and HLW, it has yet to accept even a single canister of radioactive waste. As a result, SMUD has been forced to continue storing its SNF and HWL onsite at Rancho Seco.

The Department's failure to perform beginning on January 31, 1998 constituted a partial breach of the contract. See Me. Yankee, 225 F.3d at 1343; see also Ind. Mich. Power Co. v. United States, 422 F.3d 1369, 1376-77 (Fed. Cir. 2005). The parties in this appeal dispute the amount of damages owed to SMUD for that breach.

The Government appeals because the trial court did not construct and refer to a non-breach world in calculating damages. Specifically, the Government complains that the trial court did not use the contractual acceptance rate to develop a non-breach scenario. Thus, according to the Government, the trial court did not evaluate whether SMUD would have pursued dual-purpose dry storage even if the Department had timely performed. Discernment of SMUD's motivation in constructing such a facility is complicated by factors unrelated to the breach—namely, SMUD's interest in decommissioning the plant after the voter referendum and its desire to minimize storage

expenses even in a non-breach scenario. Another important inquiry is whether the precise method of mitigation SMUD used—i.e., dual-purpose dry storage, rather than simple dry storage—must have been reasonably foreseeable to the Department at the time of contract formation. This court must also decide to what extent SMUD is entitled to recover costs for internal labor used in mitigating the Government's breach, and whether the Government is entitled to a deduction for costs related to storage of Non-Fuel Components.

II.

This court reviews contract interpretation as a question of law without deference. Winstar v. United States, 64 F.3d 1531, 1540 (Fed. Cir. 1995) (en banc), aff'd, 518 U.S. 839 (1996). Evidentiary rulings receive review for an abuse of discretion. Flex-Rest, LLC v. Steelcase, Inc., 455 F.3d 1351, 1357 (Fed. Cir. 2006) (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141-43 (1997)). A trial court's selection of a causation standard likewise "depends upon the facts of the particular case and lies largely within the trial court's discretion." Citizens Fed. Bank v. United States, 474 F.3d 1314, 1318 (Fed. Cir. 2007).

As in Yankee II, the Government's primary challenge on appeal relates to the Court of Federal Claims' choice and application of the substantial factor causation standard. As this court explained in that case, "Although the substantial factor test is not preferred, this court has refrained from reversing trial courts that have applied the substantial factor test in Winstar and SNF cases." Yankee II, No. 2007-5025 et al., Slip Op. at 5 (citing Citizens Fed., 474 F.3d at 1319; Ind. Mich., 422 F.3d at 1373).

Accordingly, this court will not infringe upon the trial court's discretion to use the substantial factor test.

License to use the substantial factor test, however, should not be mistaken for permission to ignore the burden of proof required under that test. To prove causation under the substantial factor test, "[SMUD] had the burden to prove the contractual acceptance rate and apply that rate before suggesting that the Government's breach was a substantial factor in causing [SMUD's] claimed expenses. The trial court had the obligation to hold [SMUD] to that burden." Yankee II, No. 2007-5025 et al., Slip Op. at 6.

The importance of this obligation is underscored by the factual quandary presented in this case. The Court of Federal Claims found that "until May 14, 1997, SMUD's decision to authorize expenditures for 'dual-purpose' dry storage was made for business reasons, and that the Government's subsequent January 31, 1998 breach of the Standard Contract was not a substantial causal factor in that decision." SMUD I, 70 Fed. Cl. at 365. In contrast, the trial court credited evidence that SMUD's May 15, 1997 decision to proceed with its dual-purpose dry storage facility, "despite delays, cost overruns, and the bankruptcy of a major contractor," was made in anticipation of and substantially caused by the Department's partial breach. Id.

The difficulty with the distinction drawn by the Court of Federal Claims, however, is that the court made this determination without explicitly discerning the rate at which the Department would have accepted SMUD's waste in a non-breach world. Such analysis is particularly important where, as here, plaintiff claims that but for the defendant's breach, a once prudent business decision would have been abandoned

because unforeseen circumstances rendered it economically ill-advised in a non-breach world. Indeed, the testimony relied upon by the trial court illustrates the necessity of first identifying a timetable—i.e., rate—for acceptance of spent fuel by the Department. The Court of Federal Claims gave great weight to the testimony of Rancho Seco plant manager Steven Redecker, who had responsibility for analyzing SMUD's radioactive waste storage options and whose May 15, 1997 recommendation prompted SMUD to proceed with its dry storage project. Mr. Redecker testified that his analysis presupposed that the Department would have removed all of SMUD's SNF and HLW by 2006 in a non-breach world—i.e., at an overall rate of approximately 3,000 MTU per year (from all utilities). "Had they been performing and saying, yes, we're coming in 1998 and that fuel will be gone by 2006, that would have changed the outcome of this entirely. It would have made the spent fuel pool an absolute certainty." SMUD I, 70 Fed. Cl. at 364-365.

Thus, as in Yankee II, even though the trial court attempted to dodge the contractual acceptance rate question, the court implicitly relied on such a rate in rendering its decision. As this court stated in Yankee II,

> In the absence of an express acceptance rate, this court lacks any means to evaluate the soundness of the Court of Federal Claims' contract interpretation. In any event, an acceptance rate based on assumption and approximation is not enough to support a finding of causation under the substantial factor test. In sum, the trial court had an obligation to determine the SNF and HLW acceptance rate under the Standard Contract and apply that rate in determining the substantial cause of the [utility's] costs.

Yankee II, No. 2007-5025 et al., Slip Op. at 7.

In this appeal's other companion case, PG&E II, the Court of Federal Claims did conduct an analysis to set an acceptance rate. In reviewing that case, this court

interprets the Standard Contract as requiring the Department to accept SNF and HLW in accordance with the 1987 annual capacity report process. PG&E II, No. 2007-5046. Accordingly, this court vacates and remands with instructions that the Court of Federal Claims apply the Standard Contract acceptance rate identified in PG&E II to assess causation.

III.

The trial court, after finding that the Government's breach was a substantial factor in SMUD's decision to construct a dry storage facility, also found that the use of dual-purpose dry storage canisters in that facility was not permissible pre-breach mitigation. SMUD I, 70 Fed. Cl. at 362; Sacramento Mun. Util. Dist. v. United States, 74 Fed. Cl. 727, 730 (2006) (SMUD II). Designed for dry storage, dual-purpose canisters facilitate safety and transportation because they reduce the number of times fuel must be handled. For example, other canister types require transfer to a wet pool or through a dry transfer before they can be transported.

In analyzing whether SMUD was entitled to recover costs affiliated with the development and implementation of its dual-purpose dry storage system, the Court of Federal claims found that "[t]here is no evidence in the record, however, that the Government anticipated or was aware on June 14, 1983 that any breach of the Standard Contact might require the Government to be responsible for the cost of 'dual-purpose' dry storage." SMUD I, 70 Fed. Cl. at 362. On a motion for reconsideration, the trial court reiterated this finding: "SMUD's decision to utilize 'dual-purpose' dry storage was 'not reasonably foreseeable by the Government on June 14, 1983.'" SMUD II, 74 Fed. Cl. at 730 (citations omitted). This holding misapprehends the

requirements of the foreseeability prong of the substantial factor causation test, and is therefore reversed.

Pre-breach mitigation damages are available to plaintiffs who can prove foreseeability, causation, and reasonableness. Ind. Mich., 422 F.3d 1375-76. Although the Government challenged the reasonableness of SMUD's claim, the Court of Federal Claims found that such damages were not allowable because the use of dual-purpose storage canisters was unforeseeable at the time of contracting. SMUD I, 70 Fed. Cl. at 347.

But the law does not require that the specific method of mitigation be foreseeable. Rather, the foreseeability prong applies to the type of loss, not to the means of mitigation. See Citizens Fed. Bank v. United States, 474 F.3d 1314, 1321 (Fed. Cir. 2007) ("If it was foreseeable that the breach would cause the other party to obtain additional capital, there is no requirement that the particular method used to raise that capital or its consequences also be foreseeable."). That the method of mitigation which, in hindsight, appears most reasonable and appropriate was not used should not preclude recovery. Indeed, to rule otherwise would contradict the incentives of the mitigation doctrine altogether. See PG&E I, 73 Fed. Cl. 333, 419 n.71 (2006). Accordingly, the Court of Federal Claims' finding that the use of dual-purpose storage canisters was not foreseeable at the time of contract formation was clearly erroneous and is reversed. See Bluebonnet Savings Bank v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001) ("Foreseeability is a question of fact reviewed for clear error.").

The Court of Federal Claims announced, without elaboration, a second ground for rejecting SMUD's claim for damages arising from the cost of its dual-purpose

canisters in its decision on SMUD's motion for reconsideration. "In addition, 'SMUD's decision to utilize 'dual purpose' dry storage was unreasonable.'" SMUD II, 74 Fed. Cl. at 730 (citations omitted). This court also reverses that unsubstantiated finding. "When mitigating damages from a breach, a party 'must only make those efforts that are fair and reasonable under the circumstances.'" Home Savings of Am. v. United States, 399 F.3d 1341, 1353 (Fed. Cir. 2005) (quoting Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002)); see also 11 Corbin on Contracts § 57.11, at 311 (2005 ed.) ("The doctrine of avoidable consequences merely requires reasonable efforts to mitigate damages."); 3 Dobbs: Law of Remedies § 12.6(1), at 127 (2d ed. 1993) ("[T]he damage recovery is reduced to the extent that the plaintiff could reasonably have avoided damages he claims and is otherwise entitled to."). It is the Government's burden to show that it was unreasonable for SMUD to pursue dual-purpose storage canisters to mitigate the Government's breach. See Old Stone Corp. v. United States, 450 F.3d 1360, 1370 (Fed. Cir. 2006).

The Government has not met its burden. SMUD was not alone in the development or use of dual-purpose storage. The use of dual-purpose storage canisters is near universal in the industry. Indeed, the Government did not even appeal the Court of Federal Claims' award of damages to compensate for the costs of dual-purpose storage in Yankee II and PG&E II. Yankee II, No. 2007-5025 et al.; PG&E II, No. 2007-5046  Moreover, the Department and the Nuclear Regulatory Commission actually aided SMUD in its efforts to develop and implement this technology. In light of the circumstances surrounding SMUD's dual-purpose storage efforts, the trial court's summary dismissal of those efforts as unreasonable is clearly erroneous and cannot

stand. Thus, this court reverses the determination that SMUD's pre-breach mitigation activities were unreasonable.

Causation, the remaining pre-breach mitigation factor, presents more difficulty for SMUD. As explained in Section II above, the trial court must apply the contract rate when assessing causation under the substantial factor test. Thus, this court must remand as to causation. In particular, the Court of Federal Claims must apply the Standard Contract acceptance rate in evaluating the Government's partial breach of contract as a substantial factor in causing SMUD to pursue dual-purpose storage.

IV.

The Court of Federal Claims also rejected SMUD's claim for reimbursement of internal labor costs incurred as part of its mitigation efforts. In particular, SMUD sought $13,812,040 in compensation for the time 256 of its employees charged to the dual-purpose dry storage project. In support of its request, SMUD presented evidence "detailing the percentage of hours that each SMUD employee charged to [the] 'dual-purpose' dry storage project relative to the total hours that each employee worked for SMUD." SMUD I, 70 Fed. Cl. at 376. Nevertheless, the trial court refused recovery of internal labor costs for any employee who spent less than the majority of his time on that project. Id. Under this paradigm, the labor costs from just 16 of SMUD's 256 employees who worked on the dry storage project, totaling $4,329,532, qualified for compensation. Id.; SMUD II, 74 Fed. Cl. at 735. Because the Court of Federal Claims erred in requiring SMUD to prove how it would have used its internal labor pool absent breach by the Government, this court reverses.

As explained above, an injured party can recover mitigation damages so long as it establishes that the claimed expenses were caused by the breach. See Ind. Mich., 422 F.3d at 1373. As the trial court correctly noted, "[t]he fact that an injured party has used internal resources to mitigate a breach does not foreclose the injured party from recovering such costs." SMUD I, 70 Fed. Cl. 376. Thus to recover internal labor costs incurred in mitigation of the Government's breach, SMUD must prove that it did in fact use its own employees in its mitigation efforts, and the number of hours those employees spent on mitigation related projects. See, e.g., Dunn Appraisal Co. v. Honneywell Info. Sys., Inc., 687 F.2d 877, 883-84 (6th Cir. 1982). Upon meeting these requirements, SMUD is entitled to recover only those costs arising from the time its employees spent on mitigation efforts.

The trial court, however, seeks to impose an additional requirement—namely, that SMUD must demonstrate that it would have eliminated or reassigned the employees who spent time on mitigation-related projects to collect damages to compensate for their mitigation activities. SMUD I, 70 Fed. Cl. 376. The trial court's requirement of proof of how SMUD would have employed its labor force had it not been required to divert resources to the dry storage project is unprecedented. Indeed, in this case's two companions the trial court found, and the Government did not appeal, that the utilities were entitled to recover the costs of internal labor on the dual-purpose dry storage projects at issue in those matters. Yankee Atomic Elec. Co. v. United States, 73 Fed. Cl. 249, 250-259 (2006) (Yankee I); Pac. Gas & Elec. Co. v. United States, 73 Fed. Cl. 333, 399-400 (2006) (PG&E I). Moreover, such a rule would encourage aggrieved parties to hire outside contractors—likely at greater expense—to perform

mitigation-related work rather than utilize internal resources already familiar with the facility and its operations. See S. Nuclear Operating Co. v. United States, 77 Fed. Cl. 396 442-43 ("[T]o not allow recovery [in the SNF cases] of appropriately established costs of internal labor (assuming causation and foreseeability [are] established) may lead to the use of contracts to perform future mitigation efforts at a higher cost, a result that is neither reasonable nor prudent.").

Furthermore, the trial court's distinction between employees who spent a majority of their total time on mitigation-related work and those who did not is a false one. SMUD has requested compensation for the total number of hours its workforce spent on mitigation efforts. It does not matter if 10 employees dedicated 100 percent of their time or 100 employees dedicated 10 percent of their time to mitigation work. So long as SMUD is only asking for reimbursement for the total number of hours its employees worked on mitigation projects and can prove that its employees did in fact spend that time on those projects, it is entitled to recover. Therefore, in light of the trial court's misapprehension of SMUD's burden of proof, this court reverses the trial court's grant of an offset to the Government for SMUD's internal labor expenses.

V.

The Court of Federal Claims likewise granted the Government an offset for costs arising from the storage of nonfuel SNF assembly components. Notably, the trial court raised the specter of such an offset sua sponte, without request from the Government. Post-Trial Hr'g Tr. 63:24-63:2, Aug. 23, 2006. In its Opinion Clarifying Judgment, the trial court reasoned:

> Because SMUD was decommissioning the Rancho Seco facility, nonfuel
> components were put into dry storage that otherwise would not have been

stored. See HTR 61. These nonfuel components included: control rod assemblies; burnable poison rod assemblies; power shaping rod assemblies, orifice rod assemblies, and storage cans containing cut-up incore detectors and control rods. See PX 598A at SMUD 0028244; see also HTR 65-68. Therefore, to arrive at the correct offset, the costs of the nonfuel components must be added to SMUD's proposed offset.

SMUD II, 74 Fed. Cl. at 733. Because this reasoning is factually incorrect and in contravention of the plain terms of the Standard Contract, this court reverses.

Nonfuel components are "things that typically fit inside fuel assemblies in addition to the assembly itself" and include the elements cited by the trial court in its clarification opinion. Post-Trial Hr'g Tr. 65:15-24. The Standard Contract specifically requires that the Department accept and dispose of a utility's nonfuel components "as part of the spent nuclear fuel assembly":

> Nonfuel Components. Nonfuel components including, but not limited to, control spiders, burnable poison rod assemblies, control rod elements, thimble plugs, fission chambers, and primary and secondary neutron sources, that are contained within the fuel assembly, or BWR channels that are an integral part of the fuel assembly, which do not require special handling, may be included as part of the spent nuclear fuel delivered for disposal pursuant to this contract.

10 C.F.R. § 961.11 Appx. E(B)(2) (second emphasis supplied). This provision is unambiguous: nonfuel components that are part of a fuel assembly are to be accepted by the Department under the Standard Contract. Indeed, even the Government does not dispute that "non-fuel components are covered by the Standard Contract and that DOE is to accept those items along with SMUD's SNF." App. Reply Br. at 50.

However, as the Government points out, SMUD is only entitled to collect damages related to the storage of nonfuel components that it would not have had to store if the Department had performed at the contractual acceptance rate. Therefore, on remand, the Court of Federal Claims must determine what SNF assembly storage

costs SMUD incurred because of the Department's failure to accept SMUD's waste at the contractual rate, and award damages only for that amount. The Government is not entitled to an offset for nonfuel components in assemblies that SMUD would not have had to store in a non-breach world, but SMUD is likewise not entitled to damages absent proving a causal link.

VI.

Mirroring SMUD's complaints, the Government appeals the trial court's denial of an offset to reflect the costs it asserts SMUD would have incurred had it cancelled its dry storage-related contracts in 1997. App. Br. at 42. This court detects no error in the trial court's determination that no offset is required because SMUD would have made business decisions allowing it to avoid continuing costs and obligations in the non-breach world. See SMUD II, 74 Fed. Cl. at 734. Accordingly, the Court of Federal Claims' denial of a such an offset is affirmed.

AFFIRMED-IN-PART, REVERSED-IN-PART and REMANDED

COSTS

Each party shall bear its own costs.